# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

NORBERTO M.,
     Plaintiff,

No. 3:20-cv-00891 (SRU)

     v.

ANDREW SAUL, ACTING
COMMISSIONER OF SOCIAL
SECURITY,[1]
     Defendant.

## RULING ON CROSS-MOTIONS FOR JUDGMENT ON THE PLEADINGS

In this Social Security appeal, Norberto M. ("Norberto") moves to vacate the decision by

the Social Security Administration ("SSA") denying his claim for disability insurance benefits a

second time. *See* Mot. to Reverse, Doc. No. 20. The Commissioner of the Social Security

Administration (the "Commissioner") moves to affirm the decision. *See* Mot. to Affirm, Doc.

No. 29. For the reasons that follow, I **deny** Norberto's motion and **grant** the Commissioner's.

## I.	Standard of Review

The SSA follows a five-step process to evaluate disability claims. *Selian v. Astrue*, 708

F.3d 409, 417 (2d Cir. 2013) (per curiam). First, the Commissioner determines whether the

claimant currently engages in "substantial gainful activity." *Greek v. Colvin*, 802 F.3d 370, 373

n.2 (2d Cir. 2015) (per curiam) (citing 20 C.F.R. § 404.1520(b)). Second, if the claimant is not

working, the Commissioner determines whether the claimant has a "'severe' impairment," i.e.,

an impairment that limits his or her ability to do work-related activities (physical or mental). *Id.*

(citing 20 C.F.R. §§ 404.1520(c), 404.1521). Third, if the claimant does have a severe

---

[1] On or about July 9, 2021, Kilolo  Kijakazi became the acting Commissioner of the Social Security Administration and is substituted for Andrew Saul as defendant in this action. See Fed. R. Civ. Proc. 25(d)(1). The Clerk of the Court is directed to update the docket accordingly.

impairment, the Commissioner determines whether the impairment is considered "per se disabling" under SSA regulations. *Id.* (citing 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526). If the impairment is not per se disabling, then, before proceeding to step four, the Commissioner determines the claimant's "residual functional capacity" based on "all the relevant medical and other evidence of record." *Id.* (citing 20 C.F.R. §§ 404.1520(a)(4), (e), 404.1545(a)). "Residual functional capacity" is defined as "what the claimant can still do despite the limitations imposed by his [or her] impairment." *Id.* Fourth, the Commissioner decides whether the claimant's residual functional capacity allows him or her to return to "past relevant work." *Id.* (citing 20 C.F.R. §§ 404.1520(e), (f), 404.1560(b)). Fifth, if the claimant cannot perform past relevant work, the Commissioner determines, "based on the claimant's residual functional capacity," whether the claimant can do "other work existing in significant numbers in the national economy." *Id.* (citing 20 C.F.R. §§ 404.1520(g), 404.1560(b)). The process is "sequential," meaning that a petitioner will be judged disabled only if he or she satisfies all five criteria. *See id.*

The claimant bears the ultimate burden of proving that he or she was disabled "throughout the period for which benefits are sought," as well as the burden of proof in the first four steps of the inquiry. *Id.* at 374 (citing 20 C.F.R. § 404.1512(a)); *Selian*, 708 F.3d at 418. If the claimant passes the first four steps, however, there is a "limited burden shift" to the Commissioner at step five. *Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009) (per curiam). At step five, the Commissioner need only show that "there is work in the national economy that the claimant can do; he need not provide additional evidence of the claimant's residual functional capacity." *Id.*

In reviewing a decision by the Commissioner, I conduct a "plenary review" of the administrative record but do not decide *de novo* whether a claimant is disabled. *Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 447 (2d Cir. 2012) (per curiam); *see also Mongeur v. Heckler*, 722 F.2d 1033, 1038 (2d Cir. 1983) (per curiam) ("[T]he reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn."). I may reverse the Commissioner's decision "only if it is based upon legal error or if the factual findings are not supported by substantial evidence in the record as a whole." *Greek*, 802 F.3d at 374–75. The "substantial evidence" standard is "very deferential," but it requires "more than a mere scintilla." *Brault*, 683 F.3d at 447–48. Rather, substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Greek*, 802 F.3d at 375 (citation omitted). Unless the Commissioner relied on an incorrect interpretation of the law, "[i]f there is substantial evidence to support the determination, it must be upheld." *Selian*, 708 F.3d at 417.

## II.    Facts[2]

This case was assigned to me following a remand to the Commissioner for further articulation and development of the Administrative Law Judge's ("ALJ") determination at steps three and five. I presume the parties' familiarity with the underlying facts and procedural history of this case, which were comprehensively addressed in my previous opinion. *See Martinez v. Berryhill*, 2019 WL 1199393, at *1 (D. Conn. Mar. 14, 2019). What follows is a summary of the evidence that was added to the record after the case was remanded.

---

[2] The following facts are drawn primarily from Norberto's Statement of Material Facts, doc. no. 20-1, and from the Commissioner's Response to Norberto's Statement of Material Facts, doc. no. 29-2.

A. <u>Medical History</u>

According to medical records, Norberto's medical problems began in the late 1990s, when records from the Connecticut Department of Correction note that he was treated for major depression and polysubstance dependence while he was incarcerated. R. at 1040–1145. The underlying medical record, which spans from January 1997 through April 2016, shows that Norberto paid frequent visits to the emergency room for various problems, including infections, an injury to his right hand, and pain in his arm, back, and foot. *See, e.g.*, Exs. 1F–24F, R. at 367–1145. After remand, additional evidence was submitted, and Norberto appeared with counsel before ALJ Thomas for a second hearing on February 12, 2020. The following is a summary of the pertinent evidence presented by the parties in their briefs on appeal.

In March 2015, Norberto was referred to Recovery Counseling Services ("RCS") to fulfill "court conditions" following an arrest for possession of narcotics. R. at 2662. Norberto was evaluated by Rosie Laurent, a licensed social worker at RCS, for inclusion in an outpatient program designed to treat polysubstance dependence. *Id.* It was Norberto's sixth outpatient admission for substance abuse treatment, following two previous inpatient/residential admissions. R. at 2657. During his intake evaluation, Norberto reported a long history of substance abuse issues: he started using THC (marijuana) at age 12, and by his early twenties, he was abusing cocaine and heroin. R. at 2662. Norberto explained that he had turned to heroin in 2012 because his back pain had not been alleviated by pain medication. *Id.* He reported that mental health issues caused him to isolate socially; however, he also admitted that he had been noncompliant with his prescribed mental health medications. R. at 2660–62. On May 20, 2016, Norberto tested positive for THC (marijuana) and missed his last scheduled appointments with his nurse practitioner. R. at 2656. That same day, Norberto was discharged from the program. R. at 2654. At discharge, Norberto was assigned a Global Assessment of Functionality ("GAF")

4

score of 50, a slight improvement from a year earlier when he presented with a GAF score of 44. R. at 2655, 2658.

Between March 2015 and November 2019, Norberto was referred to Ahlbin Centers for Rehabilitation Services ("Ahlbin") for physical therapy.  R. at 1546–1648; 1901–2020; 2022–2216; 2254–74.  On March 17, 2015, the physical therapist observed that Norberto's active range of motion test elicited pain, especially while performing a trunk rotation to the right.  He also walked with a slow antalgic gait; he experienced mild pain with palpation in his central lumbar area; and he walked with a cane.  R. at 1539.  Norberto complained that he had injured his back while "moving some mattresses."  R. at 1539.  He also reported that he could not manage activities of daily living because he had difficulty bending, lifting, standing and ambulating.  *Id.* But the physical therapy treatment notes show that, after each session, Norberto's pretreatment pain decreased from an all-time high of eight out of ten to two out of ten; he was "able to get through [the] exercises without complaint"; his symptoms improved while he was in the pool; and he felt the "pool [was] helping."  R. at 1539, 1549, 1553, 1557, 1561, 1568, 1575. Notwithstanding those noted improvements, Norberto's self-reported pain level remained a six out of ten in general.  R. at 1575.  On May 17, 2015, Norberto was discharged from physical therapy after he missed four appointments.  R. at 1579, 1581, 1584, 1587, 1593.

The next round of therapy sessions began on July 30, 2015.  R. at 1593.  At that appointment, Norberto walked independently without an assistive device.  R. at 1593.  On August 19, 2015, Norberto returned to physical therapy, this time wearing an over-the-counter lumbar brace and ambulating with a cane.  R. at 1598.  On August 26, 2015, Norberto reported

working odd jobs that required him to lift "an average of 25 to 30 pounds a day," which aggravated his back.[3]  R. at 1605.

After a few sessions of land therapy, a few "no show" appointments, as well as a home exercise program that Norberto reportedly completed "without difficulty," he began another round of aquatic therapy on September 14, 2015.  R. at 1618.  At that session, Norberto described his pain level at rest as a three out of ten on a pain scale, and a seven out of ten with activity.  *Id.*  On September 29, 2015, Norberto reported increased lower back pain after "helping [his] father at home mov[e] furniture."  R. at 1636.  The physical therapist noted incremental gain in Norberto's ability to tie his shoes and "[reach] during bathing"; however, he continued to have difficulty with prolonged standing and dressing.  R. at 1636–37.  Norberto missed his next two appointments, but returned to physical therapy on October 7, 2015.  R. at 1641, 1646, 1648.  He reported feeling 60% better with increased mobility overall; however, on at least two separate occasions, the physical therapist observed that Norberto walked with a limp, used a cane, and was bent forward at the waist.  R. at 1648, 2028.

On November 19, 2015, Norberto told his physical therapist that he hurt his back while biking.  R. at 2040.  Norberto used a cane to steady his slow antalgic gait; he also complained of increased pain with active range of motion.  R. at 2040.  At that session, he reported his pretreatment pain level at eight out of ten; posttreatment, however, his pain dropped to two out of ten.  *Id.*  On December 7, 2015, Norberto reported increased back pain after a weekend spent raking leaves.  R. at 2051.  His pretreatment pain level was an eight out of ten but decreased to two out of ten after the session.  *Id.*  The physical therapist noted that Norberto seemed more

---

[3]On August 26, the physical therapist observed that Norberto did not require a cane to walk, as was the case on the following dates: September 11; September 14; September 18; September 22; and September 29.  R. at 1605, 1615, 1619, 1621, 1624, 1636

uncomfortable but "[got] through the exercises" without difficulty.  *Id.*  On December 9, 2015,

Norberto reported that he felt "comfortable for most of the day after treatment." R. at 2055.

Norberto canceled the next two therapy appointments and did not return until January 5, 2016.

R. at 2059, 2062, 2067.  The physical therapist counseled Norberto about the importance of

keeping his appointments.  R. at 2067.  Because of insurance issues, however, Norberto was

transitioned to a home exercise program.  *Id.*

   In April of 2016, Norberto was referred to Ahlbin for a new course of physical therapy.

R. at 2081–91.  During those sessions, Norberto's complaints of pain and his progress toward

resolution of that pain was consistent with previous sessions of physical therapy.  Norberto

initially presented with complaints of lower back pain and numbness that radiated down both

legs.  R. at 2086–88.  He walked with a slow antalgic gait and used a cane to ambulate.  R. at

2086.  Generally, Norberto began each session with a high level of pain that improved after

physical therapy, especially if the session involved aquatic therapy.  R. at 2086–2151.  At times,

he reported engaging in physically demanding activity that aggravated his back, such as

exercising or walking.  R. at 2121, 2133, 2137–38, 2150.  He would occasionally cancel or fail to

show up to his scheduled appointments.  R. at. 2097, 2111, 2141, 2148.

   On August 5, 2016, Norberto was seen at Yale New Haven Health in Bridgeport

("YNHH-Bridgeport") for complaints of bilateral foot pain that was aggravated by "walking,

exertion and standing."  R. at 2157–67.  On a scale of zero to ten, Norberto reported a pain level

of three.  R. at 2162.  Norberto's physical exam revealed a well-developed, well-nourished male

in no distress whose mood and affect were normal.  R. at 2161.  Dr. Joseph Savage noted that

Norberto was positive for back pain and bilateral foot tenderness; however, there was no

evidence of edema or deformities.  R. at 2161.  Dr. Savage opined that Norberto's foot pain was

caused by plantar fasciitis and his chronic back pain was likely due to inflammatory spondyloarthropathy, a type of arthritis that affects the spine.[4]  R. at 2159.  Dr. Savage suggested using frozen lacrosse balls and a heel wedge to alleviate the symptoms of plantar fasciitis.  R. at 2159.  Dr. Savage ordered blood work, but no other diagnostic tests were performed.  *Id.*  Norberto was discharged on his existing medications, which he self-reported to include: Seroquel, methadone, docusate sodium, and ibuprofen, as well as Tramadol and lidocaine patches for pain.  R. at 2157–58.

On October 5, 2016, Norberto followed up with an unknown provider at Orthopedic Specialty Group, P.C. ("OSG"), who prescribed a conservative course of treatment for his back pain and ordered a repeat MRI of the lumbar spine.  R. at 2621–22.  The progress notes reveal that Norberto was "pleasant [and] in no acute distress" during the visit.  R. at 2621.  During the examination, Norberto had diminished forward flexion and extension of the lumbar spine due to discomfort and pain; nevertheless, Norberto could rise on his toes and heels, could ambulate without issue, and retained full bilateral lower extremity strength.  *Id.*  His straight leg test was negative bilaterally and he was nontender to palpation.  *Id.*  Norberto requested, and was given, refills of ibuprofen, Nexium, and Lidoderm patches, which had "worked very well for him in the past."  *Id.*

In October 2016, Norberto underwent a magnetic resonance imaging ("MRI") test of his lumbar spine.  R. at 2624.  A report prepared by radiologist Gerard J. Mura compared the October MRI to MRIs performed in April 2015 and February 2016.  R. at 2624–25.  The overall impression was of a stable lumbar spine with some chronic degenerative changes at the endplates.  R. at 2623–24.  There was no sign of active infection.  R. at 2624.  There was no

---

[4] *Spondyloarthritis: Fast Facts*, AMERICAN COLLEGE OF RHEUMATOLOGY, https://www.rheumatology.org/I-Am-A-Patient-Caregiver/Diseases-Conditions/Spondyloarthritis (last updated March 2019).

impingement of the nerve root.  R. at 2625.  Although there was mild spinal stenosis at the L4-L5 level with a moderate to marked right lateral recess stenosis, the condition was stable.  R. at 2624.  Finally, the MRI showed a collapsed disk space with kyphotic deformity, which was related to a prior discitis.  R. at 2625.  The image showed mild fluid within the disc space but was otherwise stable.  R. at 2624.

Two months later, on December 30, 2016, Norberto returned to OSG, where he was seen by Dr. Perry Shear.  R. at 2625.  Follow-up notes showed that Norberto continued to experience lumbar pain that worsened when bending, as well as intermittent numbness and tingling in his feet, but no radicular leg pain.  *Id.*  Dr. Shear observed that Norberto moved slowly from sitting to standing and used a cane to ambulate.  R. at 2625.  Dr. Shear also found that Norberto had moderate decreased flexion of the lumbar spine, as well as severe decreased extension.  *Id.*  The remaining objective findings were normal, including a straight leg raising to 90 degrees on the left side and 80 degrees on the right, normal toe and heel walking, and normal motor and sensory examinations.  *Id.*

On June 14, 2017, Norberto returned to OSG where he was seen by Tanya Dzubaty ("Dzubaty"), a physician assistant.  R. at 2628.  Norberto still complained of localized back pain with intermittent numbness and tingling on the bottoms of his feet.  *Id.*  The record shows that an electromyography exam ("EMG") was negative for radiculopathy but inconclusive for polyneuropathy.  *Id.*  Dzubaty observed that Norberto was alert and oriented, "pleasant [and] in no acute distress."  *Id.*  Although he ambulated slowly, he was able to walk on his toes and heels; his straight leg raising test was negative bilaterally; his lower extremity strength was normal bilaterally; and he was distally neurovascularly intact.  *Id.*  A lumbar x-ray performed on June 15, 2017, supports previous findings that showed a fusion of the T12 and L1 vertebrae, slight

kyphotic deformity, multi-level degenerative changes and disc space narrowing—medical conditions that were stable. *See, e.g.,* R. at 2622, 2623-24, 2625-26, 2629.

Dzubaty referred Norberto for a new eight-week course of physical therapy that began on July 6, 2017. R. at 2169; 2629. Norberto told his physical therapist that although he "was under better control after [the] last course of [physical therapy] . . . a stumble and fall" precipitated the current referral. R. at 2170. At his initial evaluation, Norberto presented with a cane. *Id.* He explained that he had trouble bending over to wash his feet; some days, he could not stand in the shower; and he experienced numbness and tingling that grew worse as the day progressed. *Id.* By July 19, 2017, Norberto had lost twenty-six pounds and was "doing well managing his [lower back pain]." R. at 2177. Unfortunately, around that same time, he reinjured his back moving furniture and his pain level returned to a six out of ten. *Id.* In the next few sessions, Norberto reported feeling greater pain due to changes in the weather and increased activity, such as walking. R. at 2181, 2193.

Between July 21, 2017 and October 15, 2019, Norberto treated with Linette Rosario-Tejeda, M.D. at St. Vincent's Multi-Specialty Group. R. at 2668–97. During the first visit, Dr. Rosario-Tejeda noted Norberto's medical history of, *inter alia*, chronic back pain, depression, non-morbid obesity, knee surgery, and hand surgery. R. at 2679–80. Norberto complained of bilateral lower leg edema and foot pain. R. at 2679. On physical examination, Dr. Rosario-Tejeda observed that although Norberto walked with a cane, his extremities appeared normal with no edema or varicosities. R. at 2680. Additionally, Norberto's mood and affect were normal, and he was in "no acute distress." *Id.* Norberto was referred to a vascular surgeon and bloodwork was ordered. R. at 2681.

On August 3, 2017, Norberto attended physical therapy, where he reported feeling much better.  R. at 2196.  He then canceled, or failed to show up for, the next two physical therapy appointments.  R. at 2200, 2202.

At a follow up appointment with Dr. Shear on August 9, 2017, Norberto presented with complaints of chronic lumbar pain related to degenerative disc disease and a prior history of lumbar discitis; as well as, bilateral foot numbness that was possibly, but not definitively, related to polyneuropathy.  R. at 2638.  Dr. Shear's examination was consistent with previous visits: Norberto ambulated with a cane; toe and heel walking were normal; there was severe decreased flexion extension of the lumbar spine; motor examination was normal; the straight leg test was performed to 80 degrees; and there was decreased sensation in both feet.  *Id.*  The record shows that Norberto was responding favorably to physical therapy, as evidenced by the observation that his "lumbar pain [had] not worsened over the last year," and Norberto's statement that "he notice[d] improvement of the lumbar pain with aquatic physical therapy."  *Id.*

On August 14, 2017, Norberto attended physical therapy.  R. at 2204.  Norberto stated that on a scale of zero to ten, with ten being the highest level of pain, his back pain was only a two.  *Id.*  Overall, his back was feeling much better and the medication "seem[ed] to be helping."  R. at 2205.  He canceled the next appointment and did not return until August 21, at which time he complained of considerable discomfort.  R. at 2208, 2210.  On August 24, 2017, he reported a pain level of eight out of ten after "walk[ing] in the morning for an hour."  R. at 2214.

Later in September, Norberto saw Dr. Rosario-Tejeda, this time for evaluation and possible treatment of hypertriglyceridemia and impaired glucose regulation. R. at 2669.  Dr. Rosario-Tejeda recognized Norberto's "non-morbid obesity due to excess calories" as an active problem.  *Id.*  She recommended dietary changes, lifestyle modifications, including smoking

11

cessation and exercise, and referred Norberto to a dietician.  R. at 2674.  Otherwise, the visit was

unremarkable: Norberto was "doing well, [and had] no acute complaints."  R. at 2669.

Almost a year later, on August 6, 2018, Norberto visited Dr. Rosario-Tejeda, who once

again noted that Norberto was doing well and had no major complaints.  R. at 2696.  The record

reveals overall benign examination findings: Norberto had lost 25 pounds since his last visit by

increasing his physical activity and eating healthier; he was ambulating normally; he had normal

movement of all extremities; he had normal gait and station; he had normal tone and muscle

strength and there was no cyanosis, edema, or varicosities in his extremities; he did not report

feeling anxious or depressed; he displayed good judgment, a normal mood and affect, and he was

active and alert.  *Id.*  Two months later, on October 12, 2018, the clinical findings were equally

unremarkable: Norberto was doing well; he had no acute complaints; he was trying to quit

smoking; he was abstaining from alcohol and drug use; his weight was normal; he did not report

feeling anxious or depressed; he displayed good judgment, a normal mood and affect, and he was

active and alert.  R. at 2690–93.  Dr. Rosario-Tejeda concluded that Norberto was an otherwise

"well adult in regular state of health."  R. at 2693.

On November 15, 2018, Norberto underwent an outpatient procedure at Bridgeport

Hospital to remove a ganglion cyst from his right fifth digit.  R. at 2227.  There were no

complications reported from the surgery.

On April 18, 2019, Norberto was seen by Dr. Rosado-Tejeda.  The mostly normal

examination findings were consistent with previous examinations that took place in July 2017,

September 2017, August 2018, and October 2018, with one exception: Norberto requested a

referral for pain management.  R. at 2690.

On July 15, 2019, Norberto was referred by physician assistant Michael J. Hann to Ahlbin for a final series of physical therapy. R. at 2251, 2655.  The physical therapist's initial evaluation noted that Norberto suffered from chronic lower back pain; he had difficulty walking long distances; he had difficulty standing; he had difficulty with car transfers; he had difficulty putting on socks and shoes; and he struggled with activities of daily living.  R. at 2256.  The record also reflects that Norberto had lost eighty pounds through diet and exercise.  *Id.*  Between July and November, the notes consistently reflect that Norberto walked with a slow antalgic gait with decreased trunk rotation and stride length; and on one occasion, he complained that his feet were falling asleep.  R. at 1903–1994, 2001–08, 2013, 2257, 2262–69.  Occasionally, Norberto would complain about increased pain that seemed to be related to exertion or changes in the weather.  R. at 1916, 1959, 1962, 1987.  For example, on August 7, Norberto reported a pain level of six after he "did some walking around at the Norwalk art show."  R. at 2272.  Otherwise, Norberto's pattern of pretreatment pain, posttreatment improvement, and missed or canceled appointments continued.  At discharge, the physical therapist's notes reflect that Norberto "progress[ed] and d[id] well in therapy" and his pain was "at a low level."  R. at 2003, 2013.  That observation was corroborated by a statement Norberto made on November 14 in which he described his pain level as a two out of ten.  R. at 2017.

On October 15, 2019, Norberto followed up with Dr. Rosado-Tejeda.  R. at 2683–85.  The examination findings were essentially the same as previous examinations, except that Norberto's blood pressure and cholesterol were elevated and he complained of back pain.  R. at 2685.  Norberto stated that physical therapy had not resolved his pain.  *Id.*  Dr. Rosado-Tejeda noted that he was in no acute distress; he showed no difficulty walking; he exhibited normal tone

and motor strength; he denied exercise intolerance, muscle aches, muscle weakness, arthralgias or joint pain; and his musculoskeletal exam was normal.  R. at 2685–86.

B. <u>Medical Source Statement – Sheila Oppenheimer, A.P.R.N.</u>

Between May and December 2019, A.P.R.N. Sheila Oppenheimer ("Oppenheimer"), a psychiatric nurse practitioner, saw Norberto on seven separate occasions—the last appointment apparently for the purpose of completing a Mental Capacity Statement ("MCS").[5]  R. at 2641. That MCS lists Norberto's DSM IV Axis I diagnoses as post-traumatic stress disorder and bipolar disorder, with a note to rule out history of psychosis.  *Id.*  Oppenheimer also noted that Norberto was on opiate/methadone maintenance and took medical cannabis; however, Oppenheimer did not prescribe any of the medications or treatments.  *Id.*  Elsewhere in the MCS, Oppenheimer mostly checked boxes indicating that Norberto's mental issues "[preclude] performance [in various categories] for 15% or more of an 8-hour day."  R.at 2641−43.  In the first grid for "mental abilities, understanding and memory," Oppenheimer wrote that Norberto "needed to write down details in order to remember."  R. at 2642.  Further down, she noted that Norberto's anxiety would increase around people, especially if he was expected to work in coordination with, or in proximity to, others without being distracted.  *Id.*  Based on Norberto's mental limitations, Oppenheimer opined that he would be "off task" more than 30 percent of an 8-hour workday; he was likely to be absent from work an average of 5 days or more per month; he was likely to be unable to complete an 8-hour workday an average of 5 days or more per month; and compared to an average worker, Norberto could be expected to perform a job 8 hours per day, 5 days per week, on a sustained basis less than 50 percent of the time.  R. at 2643−44.

---

[5] In the MCS, Oppenheimer references "prior dates" and "old medical records," but those records are not part of the extensive record that comprises this case.  R. at 2641.

C.  Procedural History

As set forth more fully below, this court's remand for further administrative proceedings resulted in Norberto's application being denied for a second time.  He now seeks an order vacating the ALJ's decision and remanding the case to the Commissioner for an award and calculation of benefits.

Norberto initially applied for supplemental security income benefits on March 7, 2013, asserting that he had been disabled by depression and back problems since April 1, 2006, a date he later amended to October 16, 2011.  R. at 21, 1192.  The SSA initially denied Norberto's claim on July 12, 2013.  R. at 21.  Norberto sought reconsideration, but the SSA adhered to its decision.  *Id.*  He requested a hearing before an ALJ, and a hearing was held before ALJ Ronald J. Thomas on September 6, 2016.[6]  R. at 38–69.  On October 4, 2016, the ALJ issued a decision concluding that Norberto was not disabled within the meaning of the Social Security Act.  R. at 21–31.  Norberto then appealed to this court, and I concluded that his case should be remanded to the Commissioner for further proceedings after holding that the RFC was not supported by the record.  *Martinez v. Berryhill*, 2019 WL 1199393, at *19 (D. Conn. Mar. 14, 2019).

1.  *Hearing – February 12, 2020*

Norberto appeared with counsel before the ALJ for a second hearing on February 12, 2020, at which the ALJ heard testimony from Norberto and Robert T. Paterwic, a vocational expert.  Tr. of ALJ Hr'g, R. at 1179–1214.  At that hearing, the ALJ questioned Norberto about his conditions, work history, treatment history, and ability to perform daily working and living functions.  *Id.*  Norberto explained that he had been laid off from his job as a machine operator in

---

[6] "Hearings scheduled for the following dates were postponed to allow [Norberto] the opportunity to secure representation:  April 21, 2015; October 6, 2015; February 25, 2016; May 11, 2016 . . . ."  R. at 21.  A hearing scheduled for August 5, 2016 was canceled because Norberto did not show up for the proceeding.  R. at 72.

2006. *Id.*, R. at 1184. After that, Norberto worked "odd jobs" until he could no longer work because of the pain in his back and his feet. *Id.* Norberto testified that he walked with a cane, which he believed had been prescribed by "Dr. Shearer and Dr. Hann." *Id.*, R. at 1188. He further testified that he lived with his parents and that his bedroom was on the second floor. *Id.*, R. at 1182–83. He told the ALJ that he had "two deteriorated discs" that caused excruciating pain. *Id.*, R. at 1185. He attributed his condition to "some type of accident" that was work related, but not covered by workmen's compensation insurance. *Id.* He also claimed that he was "in pain all the time" and that he suffered from pain and swelling in his feet. *Id.*, R. at 1186, 1189. To treat both his pain and his substance abuse issues, he was prescribed methadone at the Center for Human Services ("CHS"). *Id.*, R. at 1187. To date, his back condition had not required surgery; instead, he had been treated with cortisone shots, Lidoderm patches, tramadol, and methadone. *Id.*, R. at 1187–88. To treat the pain in his feet, Norberto performed stretching exercises. *Id.*, R. at 1190. Norberto testified that he weighed 215 pounds, and that he had recently lost 80 pounds. *Id.*, R. at 1189.

Norberto also testified that he could wash and dress himself; he could microwave food; he could vacuum occasionally; he took care of his own laundry needs; and he shopped at the grocery store. *Id.*, R. at 1190–92. Norberto testified that he drove his father's car and used public transportation, such as buses or trains. *Id.*, R. at 1192. Norberto testified that he planned to travel by airplane to attend his sister's wedding in Florida sometime in March. *Id.*, R. at 1193. He testified that he walked for 20 minutes to an hour every day, spent time with family and a few friends, and exercised using five-pound weights.[7] *Id.*, R. at 1190. Norberto claimed that he could stand while leaning against something for ten to fifteen minutes at a time and could sit for

---

[7] When prompted by his attorney, Norberto amended his statement to exercising with weights only "three days out of the month." R. at 1195.

about ten minutes at a time without pain.  *Id.*, R. at 1188.  He also testified that he tolerated the 35-minute car ride to attend the hearing without stopping for breaks.  *Id.*, R. at 1197.

Norberto testified that he enjoyed reading and drawing; he used a cell phone; he spent time on the internet, including Facebook; he was able to use text and email; and about once a week and on the weekends, he spent time with his son.  *Id.*, R. at 1194.  But he also testified that pain affected his ability to focus and caused him to become easily distracted; so much so, that he could not watch a movie or TV show from start to finish.  *Id.*, R. at 1198–99.  The pain also affected his ability to sleep at night.  *Id.*, R. at 1200.  Norberto testified that he got tired and winded quickly, which affected his ability to function on a daily basis.  *Id.*  He found the constant pain very depressing.  *Id.*

Norberto also recalled that, in the past, he had been prescribed Latuda and Seroquel for mental health issues; as of the date of the hearing, however, Norberto had been weaned off the Latuda and only took Seroquel.  *Id.*, R. at 1188–89.  Norberto stated that he engaged in monthly one-on-one sessions with Oppenheimer.  *Id.*, R. at 1189.

The ALJ next heard testimony from Vocational Expert Robert T. Paterwic ("Paterwic"). *Id.*, R. at 1201–11.  The ALJ asked Paterwic to consider a hypothetical individual with the following characteristics:  an individual of Norberto's age, education, and work background who suffered from back pain, depression, and anxiety; who was limited to the sedentary exertional level; who was unable to stay on task more than 80 percent of the time in the workplace; who could only lift five pounds intermittently; who walked limited distances with a cane and brace; and who could only sit and stand for 10 to 15 minutes.  *Id.*, R. at 1203.  With those limitations, Paterwic determined that the hypothetical individual would be unable to perform his or her past relevant work of machine operator or storage laborer.  *Id.*  The ALJ then asked whether there

were jobs in the national economy that such an individual could perform.  Paterwic responded

that the hypothetical individual would be unemployable.  *Id.*

The ALJ next asked Paterwic to assume the same individual as in the first hypothetical,

but to also assume that the individual was limited to a sedentary exertional level and required the

use of a cane to walk; furthermore, the individual was limited to occasional twisting and

squatting; bending and balancing; kneeling, crawling, and climbing, but could not climb ropes,

scaffolds, and ladders.  The individual would also need to avoid hazards, such as heights,

vibrations, and dangerous machinery, but could drive a vehicle.  Finally, the individual was

capable of simple, routine, repetitive work that did not require teamwork or working closely

with the public, and only occasionally interacted with the public, coworkers and supervisors.  *Id.*,

R. at 1203–04.  Paterwic stated that such an individual could perform the job of a surveillance

system monitor (Dictionary of Occupational Titles ("DOT") Code 379.367-010).  *Id.*, R. at

1204–05.  Paterwic listed nursing homes, adult communities, college campuses, and gambling

casinos as possible employers.  *Id.*, R. at 1205.  He testified that the Connecticut Department of

Labor listed "approximately 100 to 150 of these type[s of] jobs" and opined that, conservatively,

there were between 8,000 to 10,000 jobs available nationally.  *Id.*  Paterwic also opined that the

hypothetical individual could work as a cashier, but at a sedentary level.  *Id.*  "An example of a

sedentary cashier job would be someone working in a parking garage or someone working in a

self-service gas station."  *Id.*  He further testified that the Connecticut Department of Labor listed

"approximately 150 to 200 of these sedentary cashier type jobs, and a conservative estimate in

the national economy [would be] anywhere from 10,000 to 12,000" available jobs.  *Id.*, R. at

1206.

For the third hypothetical, the ALJ asked Paterwic to assume the same individual as in the second hypothetical, except that the individual was only limited to the light exertional level. *Id.* Paterwic testified that such an individual could not perform his or her past relevant work but could perform a job as an electronics worker (DOT Code 726.687-010). *Id.* Paterwic stated that the Connecticut Department of Labor listed "approximately 400 to 500 of these electronic worker type jobs [and a] conservative estimate in the national economy [would be] anywhere from 30,000 to 40,000" available jobs. *Id.*, R. at 1207. Paterwic also opined that the hypothetical individual could work as a janitor but only at the light exertional level. *Id.* He provided the following examples of light exertional level janitorial jobs: "someone who worked at an office building, who emptied trash, who would perform light work [but] would not run a vacuum. He would not mop a floor. He would not climb a ladder to change a light bulb." *Id.* According to Paterwic, the Connecticut Department of Labor listed approximately 200 to 300 janitorial jobs at the light exertional level. *Id.* In the national economy, Paterwic estimated that, conservatively, there were anywhere between 15,000 to 20,000 jobs available. *Id.*

Paterwic stated that his testimony was consistent with the Dictionary of Occupational Titles, "except for the clarification of the cashier job and the janitor job. The basis for [that] testimony [was] based on [his] work with employers, talking with employers, understanding the essential functions of jobs, doing employer surveys, direct job placement, and understanding the requirements of that particular job." *Id.*, R. at 1208. Paterwic explained that he relied heavily on his 25 years of experience, as well as his knowledge and experience using the Dictionary of Occupational Titles, the Department of Labor, and the O*Net for developing a methodology for determining available jobs in Connecticut and the national economy. *Id.* Paterwic explained that, in some instances, there were jobs that did not match the DOT codes exactly. *Id.*, R. at

1209.  In those cases, he relied on his expertise to provide the closest match.  *Id.*  When questioned about his methodology for determining national job numbers, Paterwic explained that it was impossible for any vocational expert to give exact national numbers, given the fact that most of the data supplied by the O*Net or the Department of Labor was filtered into an Occupational Employment Statistics ("OES") program that was based on employer surveys and sampling and did not compile data by DOT codes.  *Id.*, R. at 1210.  Paterwic testified that there was no formula for "specific numbers for specific types of jobs," he therefore provided a conservative estimate for jobs existing in the national economy based on the data available through the Department of Labor, the O*Net, as well as his experience, knowledge and understanding of the job market.  *Id.*, R. at 1208, 1210.

Finally, the ALJ inquired whether any records were missing from the file.  Norberto's counsel indicated that records from Dr. Rosario Tejeda, CHS, and Michael Hann, PA-C, were missing.  *Id.*, R. at 1212.  The ALJ gave Norberto an extra 30 days, until March 13, 2020, to submit the missing records.  *Id.*, R. at 1213.  On April 23, 2020, ALJ Thomas issued a second decision denying Norberto's claim.  *Id.*, R. at 1149.

D. The ALJ's Decision

At the first step of the five-prong inquiry, the ALJ found that Norberto had not engaged in substantial gainful activity since October 16, 2011, the amended alleged disability onset date.  R. at 1152.  At the second step, the ALJ determined that Norberto's lumbar degenerative disc disease, polysubstance abuse and depressive disorder were severe impairments, but that his obesity, right hand issues, and previous history of left leg gunshot wound were not.  R. at 1152–53.

At the third step, the ALJ found that Norberto's history of degenerative disc disease, herniations, discitis and disc bulges were not *per se* disabling because they were not severe enough to meet the criteria of an impairment listed in 20 C.F.R. part 404, subpart P, Appendix 1. *See* R. at 1154.  Specifically, the ALJ concluded that Norberto's impairments did not satisfy the "paragraph B" criteria of Listing 1.04, which requires evidence that those conditions have resulted in the compromise of a nerve root (including the cauda equina) or the spinal cord.  *Id.*

The ALJ also found that the severity of Norberto's mental impairments, considered alone and in combination, did not meet or medically equal the criteria of listing 12.04, which requires that the mental impairments result in at least one extreme or two marked limitations in a broad area of functioning:  (i) understanding, remembering, or applying information; (ii) interacting with others; (iii) concentrating, persisting, or maintaining pace; and (iv) adapting or managing oneself.  R. at 1155.  The ALJ instead determined that Norberto had only "mild" limitations in understanding, remembering or applying information and in adapting or managing oneself.  R. at 1155.  The ALJ also found that he only had "moderate" limitations in interacting with others and in concentrating, persisting, or maintaining pace.  *Id.*

Before proceeding to the fourth step, the ALJ assessed Norberto's residual functional capacity ("RFC") and determined that from October 16, 2011 to October 5, 2014, Norberto could perform work at the sedentary level, with the following exceptions:  (1) he could never climb ladders, ropes or scaffolds; (2) he needed to avoid hazards such as heights, vibrations and dangerous machinery; however, he was able to drive; (3) he needed to use a cane to walk/ambulate only; (4) he could perform simple, routine and repetitive work that did not require teamwork or working closely with the public; and (5) he could tolerate occasional interactions with the public, coworkers and supervisors.  R. at 1156.  The ALJ also found that

from October 6, 2014 to the present, Norberto had the RFC to perform light work, with the following exceptions:  (1) he could occasionally twist, squat, bend, balance, kneel, crawl and climb; (2) he could never climb ladders, ropes or scaffolds; (3) he needed to avoid hazards such as heights, vibrations and dangerous machinery; however, he was able to drive; (4) he needed to use a cane to walk/ambulate only; (5) he could perform simple, routine and repetitious work that did not require teamwork or working closely with the public; and (6) he could tolerate occasional interactions with the public, coworkers and supervisors.  *Id.*

In reaching that conclusion, the ALJ reasoned that, although Norberto's medically determinable impairments could reasonably be expected to cause the symptoms about which he testified, Norberto's statements "concerning the intensity, persistence and limiting effect of [those] symptoms [was] not entirely consistent with the medical evidence and other evidence." R at 1157.  As the basis for his determination, the ALJ articulated the steady improvement of Norberto's symptoms pre- and post-hospitalization.

From November 2012 until early 2013, Norberto required hospitalization and nursing home stays due to complications arising from intravenous drug use—specifically, an infectious discitis, which required long term antibiotic treatments.  R. at 1161.  During that time frame, the record also reflects various instances where Norberto would visit the emergency department after hurting his back lifting and moving large, heavy objects.  *Id.*  The ALJ noted that although Norberto continued to experience back pain and a limited range of spinal motion, he was also able to perform light chores, and independently engage in activities of daily living.  *Id.* "Additionally, he exhibited intact sensations, normal extremity strength, normal range of extremity motion and the ability to walk on heels and toes at subsequent examinations."  *Id.* Moreover, his positive response to treatments, normal motor examinations and his ability to

22

independently perform activities of daily living supported the conclusion that, prior to October 6, 2014, Norberto could perform a range of sedentary work.  *Id.*

The ALJ found that, after October 6, 2014, although Norberto continued to experience back pain, a decreased range of spinal motion, an antalgic gait, and decreased lower extremity sensations at some examinations, (1) his overall back pain symptoms improved with treatment; (2) his discitis and osteomyelitis resolved; (3) he had normal extremity strength, normal range of extremity movement, normal coordination; (4) his condition did not require subsequent hospitalizations; and (5) he had the ability to walk on his heels and toes, to drive a motor vehicle, and to plan a trip to Florida for a wedding, all of which supported the conclusion that his spinal issues had improved and he could perform a range of light work with additional postural and environmental limitations.  R. at 1161–62.  The ALJ reasoned that Norberto experienced an exacerbation of his back pain mostly when "he engaged in activities like moving furniture, prolonged driving, raking leaves and lifting."  R. at 1161.  The ALJ also noted that Norberto consistently told medical providers that aquatherapy and physical therapy improved his back pain symptoms; moreover, visits to his family medicine practitioner, Rosario Tejeda, M.D., on October 2018 and April 2019, revealed that Norberto was doing well; he was in no acute distress; he denied muscle weakness, difficulties walking, back pain, numbness, paralysis, memory loss, mood swings, agitation, anxiety or depression; and he ambulated normally and demonstrated normal memory skills, full orientation, normal mood and affect and good judgment.  *Id.*

With respect to the opinion evidence, the ALJ accorded "partial weight" to the opinions of state agency consultants Dr. Armstrong and Khurshid Khan, M.D., on the ground that the opinions, rendered on July and September 2013, relied on outdated and stale evidence.  R. at

1162.  The consultants, for instance, did not have access to progress notes or imaging scans that showed that Norberto's discitis and osteomyelitis had resolved after October 6, 2014, and that he had responded positively to physical therapy.  *Id.*

In late June 2013, Norberto saw Jesus Lago, M.D., for a consultative examination.  R. at 1158.  Dr. Lago opined that Norberto could adapt to a work setting, as long as he remained sober.  R. at 1163.  The ALJ gave little weight to the opinion of Dr. Lago because his opinion was vague; it did not provide a function-by-function analysis of work-related limitations; and it was based on a one-time examination.  R. at 1163.

In June and September 2013, Norberto was evaluated by state agency consultants, Thomas Hill, M.D., and Marc Zekowski, Ph.D., who reported that Norberto had mild limitations in, among other things, social functioning.  R. at 1154.  The ALJ gave little weight to the assessments submitted by Dr. Hill and Dr. Zekowski because, according to the ALJ, their opinions failed to consider the current paragraph B criteria.  *Id.*  Additionally, they failed to fully consider Norberto's limited social activities, which the ALJ found resulted in a greater limitation in Norberto's ability to interact with others.  *Id.*

In April 2016, Norberto filed for SAGA Cash Benefits.  Dr. Perry Shear was asked to provide a medical report in support of Norberto's application.  R. at 1018.  On the form, Dr. Shear noted that he had treated Norberto for "lumbar degenerative disk disease," which did not prevent Norberto from working because Norberto "[did] not work."  R. at 1019.  Further, Dr. Shear noted that he expected Norberto to be out of work between six and twelve months.  *Id.* The remainder of the form was left blank, including the physical capacities evaluation and the mental RFC evaluation.  R. 1019-23.  The ALJ also gave that opinion little weight because Dr.

Shear's statement regarding Norberto's inability to work was, in the ALJ's opinion, a disability

determination.  R. at 1165.

In December 2019, Oppenheimer completed a mental capacity statement.  R. at 2641–44.

In that statement, Oppenheimer rated 11 out of 18 listed mental abilities a "Category IV," the

most extremely impaired designation.  R. at 2641–43.  The ALJ gave Oppenheimer's opinion

little weight because she had only treated Norberto seven times before filling out the form.

Moreover, she did not know his medication regimen, and therefore could not speak to the

possibility of medication side effects that could at least contribute to mental impairments.  R. at

1165.  Finally, the ALJ found that Oppenheimer's overall opinion that Norberto "would be

unable to engage in mental work-related activities between five and thirty percent of the

workday" was not supported by "the relatively benign mental status examination findings of

record, his lack of psychiatric hospitalizations and his daily activities."  R. at 1165.

By contrast, the ALJ placed "great weight" on the opinions of the state agency medical

and psychological consultants, Dr. Hill and Dr. Zekowski, who opined that the medical

"evidence [did] not establish the presence of the C criteria" and therefore, Norberto could not

show that he had a *per se* affective disorder.[8]  R. at 1156.  Specifically, the record did not

demonstrate that Norberto showed signs or symptoms of repeated episodes of extended

decompensation; was unable to adapt to any increase in demands or change in his environment;

---

[8] To satisfy section 12.04 "paragraph C" criteria, Norberto would have to show one of the following: (1) "repeated episodes of decompensation, each of extended duration;" (2) "a residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate;" or (3) "current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement."  20 C.F.R. Pt. 404, Subpt. P, App. 1, Part A, § 12.04.

or was unable to function inside society for more than a year without a highly structured setting. R. at 1156.  At the fourth step, the ALJ found that Norberto had no past relevant work.

At the fifth and final step, the ALJ determined—based on Norberto's residual functional capacity, age, education, work experience, and the VE's testimony—that the jobs that Norberto could perform, which included surveillance system monitor (sedentary, unskilled), cashier (sedentary, unskilled), electronics worker (light, unskilled), and janitor (light, unskilled), existed in significant numbers in the national economy.  R. at 1168.  The ALJ therefore concluded that Norberto was not disabled from October 16, 2011 through April 23, 2020, the date of the decision.  *Id*.  Norberto did not seek Appeals Council review of the ALJ's April 23, 2020 decision.  *See* Compl., Doc. 1 at 3–4.  Accordingly, the ALJ's April 23, 2020 decision became the final decision of the Commissioner.

## III.    Discussion

Norberto primarily contends that the ALJ erred by (1) relying on the vocational expert's testimony that there were significant numbers of jobs in the national economy that Norberto could perform; (2) failing to develop the administrative record because he did not seek an assessment from Dr. Rosario-Tejeda, an updated medical source statement from Dr. Shear, or chart notes from Oppenheimer and CHS; and (3) discrediting Norberto's testimony about his symptoms.  *See, e.g.,* Pl's Mot., Doc. No. 20-2 at 4, 9, 21.

### A.   Vocational Expert's Testimony

On appeal, Norberto contends that he is entitled to an order reversing the ALJ's April 2020 decision and remanding the cause for a calculation of benefits.  *See id.* at 24.  He argues that the ALJ committed reversible error at Step Five of the SSA's sequential analysis.  At Step Five, the ALJ may "take administrative notice of 'reliable job information' available from

various governmental and other publications."  SSR 00–4p, 2000 WL 1898704 at *2 (S.S.A.

Dec. 4, 2000).  The ALJ may also obtain "information about a particular job's requirements or

about occupations not listed in the DOT" by referencing "other reliable publications, information

obtained directly from employers, or from a [vocational expert's] . . . experience in job

placement or career counseling."  *Id.*

The Norberto argues that the ALJ's vocational analysis was defective because the vocational

expert "did not cite a single source upon which he could have relied for his job incidence

testimony."  Pl's Mot., Doc. No. 20-2 at 4 (emphasis omitted).  Further, Norberto argues that the

vocational expert failed to "provide a cogent and thorough explanation of his methodology for

calculating job incidence numbers."  *Id.* at 5.  Finally, Norberto contends that the ALJ erred by

relying on testimony from the vocational expert because that testimony deviated from the DOT.

The Commissioner argues that the vocational expert identified his sources when he

testified and "that his testimony was based on 25 years of experience and working directly with

employers in terms of direct job placement, job recruitment, understanding the essential

functions of jobs, doing employer surveys, as well as the DOT, the Department of Labor, and the

O*Net."  Def's Mot., Doc. 29-1 at 13–14.  I will address each of the arguments in turn, although

there is substantial overlap among them.

### 1.  *Job Incidence Testimony*

In my previous order, remand was appropriate because the vocational expert relied

primarily on the DOT for his testimony regarding the number of available positions in the

economy, and because no other substantial evidence existed in the record to support the

availability of jobs.  *Martinez*, 2019 WL 1199393, at *19.  In reaching that conclusion, I relied

on, *inter alia*, and applied the Second Circuit's holding in *Brault*, in which the Court held that a

vocational expert is not required to identify with specificity the figures or sources supporting his conclusion so long as the sources are identified generally. *Id.* at *18 (citing *Brault v. Soc. Sec. Admin., Com'r*, 683 F.3d 443, 450 (2d Cir. 2012)).  The problem with the vocational expert's previous testimony was that, when identifying the number of jobs that existed nationally or locally, he only cited to the DOT and failed to cite to a single other source to support his conclusion.  *Id.*  As the Second Circuit explained, "[t]he DOT . . . just defines jobs. . . [i]t does not report how many such jobs are available in the economy."  *Brault,* 683 F.3d at 446.  Therefore, the vocational expert's opinion may have been adequate regarding the *types* of jobs available in the economy, but not for the number of jobs.  In other words, the testimony failed to meet the "substantial evidence" standard.  *Id.,* at 450.

Since my holding in *Martinez*, the Supreme Court decided *Biestek v. Berryhill*, 139 S. Ct. 1148, 1157 (2019), in which it held that the inquiry for determining the substantiality of evidence "takes into account all features of the vocational expert's testimony, as well as the rest of the administrative record, and defers to the presiding ALJ, who has seen the hearing up close."  In *Biestek*, the Court accepted the parties' stipulation that a "vocational expert's testimony may count as substantial evidence even when unaccompanied by supporting data."  *Id.* at 1155.  The Court held that vocational experts may rely on publicly available sources as well as data developed through their own experiences and research.  *Id.* at 1152; *see also* SSR 00–4p, 2000 WL 1898704 (Dec. 4, 2000).  Stated another way, a vocational expert's testimony has evidentiary value if "a reasonable mind" could accept the expert's testimony and the testimony is supported by the record.  *Biestek*, 139 S. Ct. at 1156; *McIntyre v. Colvin*, 758 F.3d 146, 151 (2d Cir. 2014) ("An ALJ may rely on a vocational expert's testimony regarding a hypothetical as long as 'there is substantial record evidence to support the assumption[s] upon which the

vocational expert based his opinion'"). With the Supreme Court's holding in mind, I once again address whether the ALJ's vocational analysis was insufficient to support the ALJ's findings.

Norberto's argument is two-fold: first, he argues that Paterwic did not cite any sources supporting his job incidence testimony; and second, he argues that Paterwic did not "provide a cogent and thorough explanation of his methodology for calculating job incidence numbers." Pl's Mot., Doc. 20-2 at 4–5. It is important to remember that, at the previous hearing, the vocational expert failed to cite any sources that formed the basis for the job numbers, including his own expertise. R. at 62–68. Here, however, Paterwic explained how he relied on his "25 years [of] experience of working with employers directly in terms of direct job placement, job recruitment, understanding the essential functions of jobs, doing employer surveys . . . as well as [his] knowledge and experience . . . using the Dictionary of Occupational Titles, the Department of Labor, and the O*NET." R. at 1208. Paterwic also explained that it was impossible for any vocational expert to give exact national numbers because most of the data in the Occupational Employment Statistics program is based on employer surveys and sampling. R. at 1210. As a result, the process is "not an exact science." *Id.* Because Paterwic could not come up with "specific numbers for specific types of jobs," he relied on his experience to interpret the data and come up with conservative estimates for jobs in the national economy.

To be clear, the vocational expert was not required to "provide a cogent and thorough explanation of his methodology for calculating job incidence numbers." Pl's Mot., Doc. No. 20-2 at 5; *Biestek*, 139 S. Ct. at 1155–56 (holding that expert testimony can sometimes surmount the substantial-evidence bar absent underlying data); *McIntyre v. Colvin*, 758 F.3d at 152 ("a vocational expert is not required to identify with specificity the figures or sources supporting his conclusion, at least where he identified the sources generally."); *Bayliss v. Barnhart*, 427 F.3d

1211, 1218 (9th Cir. 2005) ("A VE's recognized expertise provides the necessary foundation for his or her testimony . . . no additional foundation is required."). There is neither a rigid formula nor a bright-line rule for determining the number of jobs that exist for particular DOT titles. On the contrary, the Supreme Court's recent decision established that the inquiry for probing the strength of an expert's testimony, and determining whether that testimony counts as substantial evidence, is determined on a case-by-case basis, not by applying a categorical rule. *Biestek*, 139 S. Ct. at 1157.

Here, the vocational expert used reliable statistical sources, as well personal knowledge and experience, to develop the occupational projections that he provided. Although the vocational expert did not provide a step-by-step description of the methodology he used, it was within the ALJ's discretion to rely on that testimony because it was the kind of evidence "'that a reasonable mind might accept as adequate to support' a finding about job availability." *Biestek*, 139 S. Ct. at 1154 (citing *Consol. Edison Co. of New York v. N.L.R.B.,* 305 U.S. 197, 229 (1938)). With that in mind, I hold that the ALJ was permitted to rely on the vocational expert's testimony, without further inquiry or explanation, when determining whether a sufficient number of qualifying jobs existed in the national economy.

2. *DOT Deviation*

Norberto additionally contends that the ALJ erred at step five because he based his findings on testimony that was inconsistent with the DOT. At the hearing, Paterwic testified that the cashier job and the janitor job, which are classified at the light and medium exertional levels by the DOT, could be performed at the sedentary and light exertional levels instead. R. at 1205, 1208. By way of example, Paterwic stated that a cashier working in a parking garage or in a self-service gas station would be required to perform at a sedentary physical exertion level,

30

which involves sitting most of the time; standing or walking for brief periods of time; and lifting, carrying, pushing, or pulling ten pounds occasionally.  R. at 1205; *see also* 20 C.F.R. § 404.1567(a).  According to Paterwic, a janitor in an office building performs work at a light exertional level because the position primarily involves emptying trash cans—not mopping floors, changing lightbulbs, or running a vacuum.  R. at 1207.  At the conclusion of Paterwic's testimony, the ALJ asked him whether his testimony had "been consistent with the Dictionary of Occupational Titles, per Social Security Ruling 00-14," and if not, the ALJ asked Paterwic to explain the basis for his testimony.  *Id.*  Paterwic responded that his testimony was consistent with the DOT, "except for the clarification of the cashier job and the janitor job."  R. at 1208. Paterwic explained that, for those positions, he based his testimony on his "work with employers, talking with employers, understanding the essential functions of jobs, doing employer surveys, direct job placement, and understanding the requirements of that particular job."  R. at 1208.

At the hearing, Norberto's attorney was given an opportunity to examine the vocational expert.  Counsel questioned Paterwic about the industry designation for the surveillance system monitor job, but did not ask any questions about the cashier or janitor positions.  R. at 1209. Counsel pointed out that, although Paterwic testified that the surveillance system monitor position could be performed in a nursing home, an adult community, a college campus, or a gambling casino, the DOT description listed public transportation terminals as the location for that type of work.  *Id.* at 1208–09.  In response, the vocational expert acknowledged that the job description was not an exact match and that, as described by the DOT, the job was performed in public transportation terminals.  *Id.* at 1209.  In his experience working with employers, however, Paterwic explained that nursing homes and gambling facilities also employ "system monitors" and the DOT code that he provided was the closest match for those jobs.  *Id.*

Norberto now argues that the vocational expert failed to follow the procedural requirements of SSR 00-4p when he testified that the positions of "cashier" and "janitor" were performed at the sedentary and light exertional levels respectively—an opinion that conflicts with the DOT classifications.  Pl's Mot., Doc. 20-2 at 6.  The Commissioner concedes that "it is against agency policy to rely on testimony that a job has a different classification than is stated in the DOT," but maintains that the error was harmless because those were not the only jobs identified by Paterwic.  Def's Mot., Doc. 29-1 at 17.

Social Security Ruling 00-4P states that "[w]hen there is apparent unresolved conflict between VE . . . evidence and the DOT, the [ALJ] must elicit a reasonable explanation for the conflict before relying on the VE . . . evidence to support a determination or decision about whether the claimant is disabled." *Steven N. v. Berryhill*, 2018 WL 6629681, at *14 (W.D.N.Y. Dec. 19, 2018) (citing SSR 00-4P, 2000 WL 1898704, at *2 (Dec. 4, 2000)).  "The adjudicator must resolve the conflict by determining if the explanation given by the VE . . . is reasonable and provides a basis for relying on the VE . . . rather than on the DOT information." *Id.*  Thus, "[a]n ALJ may rely on inconsistent VE testimony if it is based on the VE's experience, information obtained from employers, or information obtained from another reliable source." *Gallegos v. Colvin*, 2014 WL 4635418, at *4 (D. Conn. Sept. 11, 2014)

Hence, in order to determine whether the vocational expert's testimony was reliable, the ALJ had a duty to inquire about the conflict between Paterwic's testimony and the DOT classifications.  *Steven*, 2018 WL 6629681, at *14 ("When an ALJ fails to reconcile VE testimony with the DOT information, remand may be appropriate."); *see also* SSR 00–4p.  In this case, the duty to inquire was triggered by the vocational expert's testimony, and the ALJ satisfied that duty by asking Paterwic to clarify the conflict between his opinion and the

32

provisions of the DOT.  A fair reading of the hearing transcript reflects that the ALJ asked for, and received, a reasonable explanation for the discrepancies between the vocational expert's classifications and DOT's classifications.  R. at 1207–08.  Paterwic testified that he based his testimony on his experience with job recruitment, his knowledge of job functions, and on information obtained through employers by way of surveys and direct job placements.  *Id.* at 1208.  Paterwic then provided specific examples of cashier and janitorial jobs that could be performed at a lower exertional level than the DOT's classification for those positions.  *Id.* at 1205, 1207.  He also explained that the job description for surveillance system monitor, DOT Code 379.367-010, was the closest match to the type of video surveillance that takes place in nursing homes, adult communities, college campuses, and gambling casinos.  R. at 1205, 1209. Furthermore, based on his knowledge of working with, and talking to employers, he testified that surveillance system monitor positions are not limited to public transportation terminals.  R. at 1209.  Therefore, I am satisfied that the conflicts were addressed by the ALJ and reasonable explanations were provided by the vocational expert.  The vocational expert's testimony was sufficient to meet the Commissioner's burden of proving that jobs were available within Norberto's residual functional capacity.

But even if the ALJ erred by accepting Paterwic's classifications for the cashier and janitorial jobs when the DOT provided a different classification, the error is harmless.  Because Paterwic identified two other jobs that Norberto could perform at both the light exertional level and the sedentary level, and "[t]he Commissioner need show only one job existing in the national economy that [Norberto] can perform[,]" any error was harmless.  *Bavaro v. Astrue*, 413 F. App'x 382, 384 (2d Cir. 2011); *see also* 42 U.S.C. § 423(d)(2)(A); 20 C.F.R. § 404.1566(b).  In light of the evidence that Norberto could perform two of the four positions identified,

surveillance system monitor with a conservative estimate of 8,000 to 10,000 jobs available in the national economy and electronics worker with a conservative estimate of 30,000 to 40,000 jobs available in the national economy, a remand on this issue is not required.

B. <u>The ALJ Failed to Adequately Develop the Record.</u>

Norberto argues that the ALJ erred by failing to request an additional evaluative opinion from Norberto's orthopedist, Dr. Perry Shear; a medical source statement from Dr. Rosario-Tejeda; medical records from nurse practitioner Sheila Oppenheimer; and medical records from CHS. *See* Doc. No. 20-2, at 9, 12. The Commissioner argues that the ALJ's duty to develop the record was not endless, and the record was more than sufficient to render a disability determination. I agree with the Commissioner, and for the reasons that follow, conclude that the ALJ had no further duty to develop the record.

1. *Medical Source Statements*

"[T]he ALJ, unlike a judge in a trial, must . . . affirmatively develop the record in light of the essentially non-adversarial nature of a benefits proceeding, even if the claimant is represented by counsel." *Tejada v. Apfel*, 167 F.3d 770, 774 (2d Cir. 1999) (citation omitted) (internal quotation marks omitted). It is not "*per se* error [however] for an ALJ to make a disability determination without having sought the opinion of the claimant's treating physician." *Sanchez v. Colvin*, 2015 WL 736102, at *5 (S.D.N.Y. 2015). "[W]here there are no obvious gaps in the administrative record, and where the ALJ already possesses a 'complete medical history,' the ALJ is under no obligation to seek additional information." *Pellam v. Astrue*, 508 F. App'x 87, 90 (2d Cir. 2013) (citing *Rosa v. Callahan*, 168 F.3d 72, 79 n.5 (2d Cir. 1999)).

Thus, the failure of the ALJ to procure formal opinions about a claimant's residual functional capacity does not, by itself, require remand where the medical record is "quite

extensive[,] . . . voluminous[,] . . . [and] adequate to permit an informed finding by the ALJ."
*Tankisi v. Comm'r of Soc. Sec.*, 521 F. App'x 29, 34 (2d Cir. 2013).  "Remand is not always
required when an ALJ fails in his duty to request opinions particularly where . . . the record
contains sufficient evidence from which an ALJ can assess the petitioner's residual functional
capacity."  *Id.*  Remand is required, however, where an ALJ's residual functional capacity
decision is "wholly unsupported by any medical evidence."  *Jermyn v. Colvin*, 2015 WL
1298997, at *19 (E.D.N.Y Mar. 23, 2015).  The key factor is whether the record contains a
medical opinion from either a treating or examining source that indicates what the claimant can
and cannot do.  *See Hooper v. Colvin*, 199 F.Supp.3d 796, 815 (S.D.N.Y. 2016) (remand is
required where ALJ "made [claimant's] disability determination based on a record devoid of any
truly complete medical opinion").

Here, the ALJ was not required to obtain a medical source statement from Dr. Rosario-
Tejeda or an updated statement from Dr. Shear because the record was voluminous, the medical
evidence was unambiguous, and the ALJ had available to him the opinions of many treating and
examining physicians that identified Norberto's functional limitations.  As the Second Circuit
explained in *Tankisi*, "remand is not always required" if an ALJ fails to request medical opinions
when "the record contains sufficient evidence from which an ALJ can assess the petitioner's
residual functional capacity."  *Tankisi*, 521 F. App'x at 34 (holding that an ALJ was not required
to seek a medical source statement or formal medical opinion in determining the claimant's RFC
where the medical record was voluminous and included an assessment of the claimant's
limitations from a physician); *see also Ramos v. Berryhill*, 2019 WL 3543659, at *8 (D. Conn.
Aug. 5, 2019) ("Although the record does not contain formal opinions on [the claimant's RFC]
from her treating physicians, the breadth and depth of medical records available from both before

and during the alleged disabling period were adequate for the ALJ to assess residual functional capacity."); *Moreau v. Berryhill*, 2018 WL 1316197, at *12 (D. Conn. Mar. 14, 2018) (noting that, in some cases in which ALJs failed to develop the record regarding a treating source's opinion, courts did not remand the case to the SSA "because, even without further development of that treating source's opinion, the record was sufficiently complete for the ALJ to make a substantially supported RFC determination").  Here, the record contains medical opinions from examining sources assessing Norberto's functional limitations.  R. at 111–45.  Moreover, although the state agency consultants' opinions were rendered in 2013, the record shows that Norberto's conditions remained stable or improved with time.  Perhaps more importantly, the ALJ's RFC assessment already included greater restrictions than those proposed by the state medical consultants.  Therefore, the ALJ had no further obligation to supplement the record by acquiring new medical source statements from Norberto's treating physicians.

2.  *Medical Records*

Norberto argues that the ALJ erred by not requesting treatment records from Michael Hann, PA-C, a physician assistant at Connecticut Orthopaedics, and Oppenheimer, Norberto's mental health provider.  Pl's Mot., Doc. 20-2, at 12–13.  In the case of Oppenheimer, the error, according to Norberto, is particularly egregious because Oppenheimer "actively treated" him for at least seven months.  Pl's Mot., Doc. 20-2, at 12.  The Commissioner contends that the ALJ fulfilled his duty to develop the record by keeping the record open for another month following the hearing.  Def's Mot., Doc. 29-1, at 9.  But the ALJ's duty to "compile a complete record" is an affirmative one that requires more than just "keeping the record open."  *Brown v. Apfel*, 174 F.3d 59, 63 (2d Cir. 1999).

This case has a long history.  Norberto's medical records date back to January 30, 1997, when he was treated in the medical wing of the Connecticut Department of Corrections.  R. at 1025–1145.  The most recent physical therapy records from Ahlbin are dated November 14, 2019, just five months before the ALJ rendered his most recent decision.  R. at 2015-20.  The last mental source statement from a treating provider was added to the record on December 27, 2019. R. at 2641–44.  The record reflects that Norberto was afforded every opportunity to present his evidence.  The ALJ scheduled six separate hearings on this matter: four hearings were rescheduled to give Norberto an opportunity to obtain counsel (R. at 76, 82, 86, 90); one hearing was rescheduled because Norberto failed to appear (R. at 72); and two hearings proceeded as scheduled without any delay (R. at 38–68; R. at 1178–1214).  In April 2020, counsel informed the ALJ that records requested in December 2019 from Dr. Rosario Tejeda, CHS, and Michael Hann, PA-C, were missing.  R. at 1212–13.  In response, the ALJ extended the time during which Norberto could submit post-hearing evidence by one month.  R. at 1213.  "Post-hearing records were received from Dr. Tejeda, Recovery Network and Connecticut Orthopedics," but not Michael Hann specifically.  R. 1150.  Norberto's counsel did not contact the ALJ to request more time to submit the records, and now faults the ALJ for failing to obtain those same records. R. at 1150.

I agree with Norberto that the ALJ erred when he failed to obtain Oppenheimer's therapy notes and Michael Hann's treatment notes.  However, the error was harmless because other "substantial evidence in the record" supported the ALJ's conclusions.  *McIntyre*, 758 F.3d at 152; *Zhong v. U.S. Dep't of Just.*, 480 F.3d 104, 117 (2d Cir. 2007) ("when overwhelming evidence in the record makes it clear that the same decision is inevitable," remand is not warranted); *Kohler v. Astrue*, 546 F.3d 260, 269 (2d Cir. 2008) (stating that harmless error may

not necessitate remand to agency).  The record in this case is adequate to permit an informed finding by the ALJ about the claimed disability without the missing records; it includes hospital records, radiology reports, office treatment notes from numerous doctors, several consultative examination reports, and several years' worth of progress notes from physical therapists.

The transcript contains numerous updated medical records, dating from October 26, 2011 to December 29, 2016, from Connecticut Orthopedics.  R. at 2645–53.  Norberto does not specify why a further inquiry of Michael Hann's records would have been necessary, given the records already available from Connecticut Orthopedics.  The record also contains updated treatment notes from RCS, which, according to its website, is affiliated with the Center for Human Services.[9]  The intake forms from RCS indicate that Norberto described himself as a "loner" who preferred to "stay away from people."  R. at 2660.  That statement was properly considered by the ALJ when formulating the RFC and hypothetical questions.  For instance, the ALJ found that the consultants' "assessments regarding [Norberto's] ability to interact with others failed to fully consider [his] limited social activities, resulting in more limitations in the area of interacting with others than the state agency consultants purported."  R. at 1154.  Hence, Norberto has not shown how he was prejudiced by the missing records.  The medical record also shows that Norberto treated with Oppenheimer between May and December 2019 for a total of seven visits.  R. at 2641.  Norberto has not explained what, if anything, those seven visits would show, other than to surmise that the progress notes "could reasonably be expected to have provided support for her clinical opinions."  Pl's Mot., Doc. 20-2 at 13.  To the extent that the ALJ may have erred by failing to obtain the records *sua sponte*, the error does not require

---

[9] Recovery Network of Programs, https://recovery-programs.org/services/addiction-treatment/medication-assisted-treatment/center-for-human-services/ (last visited Sept. 27, 2021).

reversal; particularly where, as here, the record was sufficiently developed to allow the ALJ to make a reasoned decision.

## C. Credibility

Norberto argues next that "the ALJ's failure to account in an adequate manner for [Norberto's] chronic pain was error, particularly in light of the objective evidence of record." Pl's Mot., Doc. 20-2 at 22.  The Commissioner argues that the ALJ properly considered Norberto's claims of pain but found that Norberto's "claims of disabling pain and limitations . . . were not fully consistent with the other evidence of record and set forth appropriate reasoning with citations to the record."  Def's Mot., Doc. 29-1 at 10.  Norberto's argument is unavailing. Still, having reviewed the record and Norberto's arguments, I briefly address Norberto's contention that the ALJ improperly discredited his testimony about pain symptoms.

Per the Social Security regulations, Norberto's subjective statements about his pain, taken alone, are not sufficient for an ALJ to make a disability finding. 20 C.F.R. § 416.929(a).  An ALJ must employ a two-step process for evaluating symptoms, such as pain. "First, the ALJ must determine whether the medical signs or laboratory findings show that a claimant has a medically determinable impairment that could reasonably be expected to produce the claimant's" pain. *Cichocki v. Astrue*, 534 F. App'x 71, 75 (2d Cir. 2013) (summary order).  An ALJ must consider all of the claimant's "symptoms, including pain, and the extent to which [his] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence." 20 C.F.R. § 416.929(a).  The ALJ "will consider all of [a claimant's] statements about [his] symptoms, such as pain, and any description [his] medical sources or nonmedical sources may provide about how the symptoms affect [his] activities of daily living and [his] ability to work." *Id.*  An ALJ must have "objective medical evidence from an acceptable medical source" that

shows that a claimant has a medical impairment or impairments that "could reasonably be expected to produce the pain or other symptoms alleged." *Id*.

If the ALJ finds that the first step is met, then he must "'evaluate the intensity and persistence of [the claimant's] symptoms' to determine the extent to which the symptoms limit the claimant's capacity for work." *Cichocki*, 534 F. App'x at 75 (citing 20 C.F.R. § 416.929(c)(1)). In doing so, the ALJ considers "all of the available evidence" from medical and nonmedical sources, including objective medical evidence, but will not reject a claimant's subjective assessment of the intensity and persistence of his pain "solely because the available objective medical evidence does not substantiate [his] statements." 20 C.F.R. §§ 416.929(c)(1), (2). "However, if a claimant's statements about [his] symptoms are not substantiated by the objective medical evidence, the ALJ must consider the other evidence and make a finding on the credibility of the individual's statements." *Cichocki*, 534 F. App'x at 76 (citing *Social Security Ruling 96-7p*, 1996 WL 374186, at *4 (July 2, 1996)). In doing so, the ALJ should consider the following factors: daily activities; "[t]he location, duration, frequency, and intensity" of the pain; "[p]recipitating and aggravating factors;" "[t]he type, dosage, effectiveness, and side effects of any medication" taken to alleviate pain; "[t]reatment, other than medication" received for pain relief; measures used to relieve pain; and "[o]ther factors concerning . . . functional limitations and restrictions due to pain[.]" 20 C.F.R. § 416.929(c)(3).

Further, an ALJ will consider a claimant's subjective claims of pain "in relation to the objective medical evidence and other evidence, in reaching a conclusion as to whether [he is] disabled" and will consider "whether there are any inconsistencies in the evidence and the extent to which there are any conflicts" between the claimant's subjective claims of pain and the "rest of the evidence," including the claimant's history, laboratory findings, and medical source

statements regarding pain.  20 C.F.R. § 416.929(c)(4).  If an ALJ determines that a claimant does

have severe impairments, but the impairments do not meet or equal a listed impairment, then the

ALJ "will consider the impact" of the claimant's impairment or impairments and related pain on

the claimant's residual functional capacity. 20 C.F.R. § 416.929(d)(4).

"The ALJ's decision 'must contain specific reasons for the finding on credibility,

supported by the evidence in the case record, and must be sufficiently specific to make clear to

the individual and to any subsequent reviewers the weight the [ALJ] gave to the individual's

statements and the reasons for that weight.'" *Cichocki*, 534 F. App'x at 76 (citing *Social

Security Ruling 96-7p*, 1996 WL 374186, at *2)).  In making such a determination, the ALJ must

provide more than just "a single, conclusory statement" regarding the claimant's credibility or a

recitation of the relevant factors, but "remand is not required where 'the evidence of record

permits [the court] to glean the rationale of an ALJ's decision[.]'"  *Id.*  (citing *Mongeur*, 722

F.2d at 1040).

Here, the ALJ concluded that Norberto's "medically determinable impairments could

reasonably be expected to cause the alleged symptoms" but declined to credit Norberto's

testimony regarding the "intensity, persistence, and limiting effects of [those] symptoms."  ALJ

Decision, R. at 1157.  The ALJ found that Norberto's statements were "not entirely consistent

with the medical evidence" and other record evidence.  *Id.*  Throughout his decision, the ALJ

acknowledged that Norberto was suffering from back pain; however, he also cited to many

entries that seemed to conflict with his subjective claims of disabling pain.  *See id.* at 1157

(noting Norberto's testimony that he had pain with bending; was taking pain medication; was

limited in his range of motion; and was using a cane to ambulate); *id.* at 1153–61 (noting hospital

records and diagnostic tests for complaints of back pain; noting pain relief measures); *id.* at 1159

(noting improvement in pain through physical therapy); *id*. at 1159–61 (noting that Norberto

drove, took the bus, dressed and bathed himself, walked for twenty minutes to one hour every

day, used a microwave, planned a trip to Florida, and engaged in hobbies, like drawing).  For

example, the ALJ noted the many times that Norberto re-injured himself while participating in

strenuous activities, directly contradicting Norberto's statement that he was in constant,

"excruciating pain" and could not lift anything over ten pounds.  *Id*. at 1161; R. at 1185.  Indeed,

the record reflects that Norberto routinely injured himself moving furniture, appliances, and

other heavy objects.  *See* R. at 368 (sought treatment for back pain after lifting a TV); R. at 374

(sought treatment for back pain after moving a dresser); R. at 377-78 (sought treatment for back

and arm pain after lifting rocks); R. at 382 (sought treatment for back pain after helping someone

move); R. at 397-98 (sought treatment for back pain after moving a refrigerator); R. at 509

(sought treatment for back pain after lifting heavy object); R. at 793 (reinjured back after moving

furniture). The record also reflects that Norberto testified that he was able to do light chores, take

care of his activities of daily living, and function independently.  R. at 1192–94.

  The ALJ's determination of Norberto's RFC did not fail to account for the chronic pain

but took it into serious consideration, as evidenced by the fact that the ALJ made two separate

RFC findings: prior to October 6, 2014, when Norberto required hospitalizations and significant

treatment for his discitis and osteomyelitis and after October 6, 2014, when the record shows that

his discitis and osteomyelitis had resolved.

  Specifically, between October 16, 2011 and October 5, 2014, the ALJ "considered all

symptoms and the extent to which [those] symptoms [could] reasonably be accepted as

consistent with the objective medical evidence and other evidence" and determined that Norberto

had the residual functional capacity to perform sedentary work.  R. at 1156.  After October 2014,

the ALJ noted improvements in Norberto's medical condition and determined that he could perform light, unskilled work.  ALJ Decision, R. at 1161–62.  The ALJ referenced the multiple MRIs taken of Norberto's discitis that showed a complete resolution of his previous discitis and osteomyelitis; as well as, the physical therapy records and treatment notes that reflected 40% improvement in back pain.  R. at 1159, 1161; *see also* R. at 2017 (pain down to a 2 out of 10 after completing physical therapy); R. at 2623–24 (MRI shows no evidence of active infection and no change from previous MRI; continued improvement); R. at 2625 (MRI shows no nerve root impingement); R. at 2622 (X-Ray showing condition was stable); R. at 1618 (improvement with aquatherapy; no cane).  In sum, the ALJ adopted limitations that took into account Norberto's statements of pain; and contrary to Norberto's argument, the ALJ linked his credibility findings with the medical evidence of record.  Therefore, remand is not warranted on that issue.

## IV.     Conclusion

For the reasons set forth, I **grant** the Commissioner's motion to affirm, and **deny** Norberto's motion to reverse.  The Clerk is directed to enter judgment in favor of the Commissioner and close the case.

So ordered.

Dated at Bridgeport, Connecticut, this 30th day of September 2021.

/s/ STEFAN R. UNDERHILL
Stefan R. Underhill
United States District Judge